**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

CELLECTAR BIOSCIENCES, INC.,

                Plaintiff,

      v.

JAMEY WEICHERT AND ANATOLY
PINCHUK,

                Defendants.

Case No. 21-cv-653

## <u>COMPLAINT</u>

Plaintiff Cellectar Biosciences, Inc. ("**Cellectar**" or "**Plaintiff**"), by and through its

undersigned counsel, for its Complaint against Defendants Dr. Jamey Weichert ("**Weichert**")

and Dr. Anatoly Pinchuk ("**Pinchuk**") (collectively, "**Defendants**"), alleges upon personal

knowledge with respect to itself and its own acts, and upon information and belief as to other

matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.      This lawsuit seeks to dispel a cloud over Cellectar's rightful ownership of

valuable intellectual property rights in cancer-diagnosing and cancer-treating technology that

was developed through its substantial efforts, investment, and ingenuity.  That cloud exists due

only to the wrongful acts of Defendants, who are former Cellectar personnel who undertook to

enrich themselves at the expense of the company.

2.      Both Weichert and Pinchuk worked for Cellectar for many years and well

understood that their research and developments generated in connection with the company's

activities belonged to Cellectar.  In fact, both individuals' contracts with Cellectar unequivocally

provided that all fruits of such labors were automatically assigned to the company, and further required Weichert and Pinchuk to maintain the confidentiality of company information, not to engage in commercial activities competitive with Cellectar's, and to avoid conflicts of interest.

3.     As a director and officer of Cellectar, Weichert also had fiduciary duties to act in the company's best interests and not use his position of trust to co-opt Cellectar's benefits for himself.

4.     Yet co-opting Cellectar's benefits for himself is precisely what Weichert did. During the course of his tenure with Cellectar, Weichert put into action a plan to shield the development of certain intellectual property from the company and steer that intellectual property to a biotechnology startup company that he had surreptitiously founded called Archeus Technologies, Inc. ("**Archeus**").

5.     As detailed herein, Weichert's scheme principally concerned breakthroughs conceived of and realized by Pinchuk in the course of his work as an employee and consultant of Cellectar.  Without Cellectar's knowledge, Weichert coordinated a purported assignment of that technology by Pinchuk to a third party even though Pinchuk still worked for Cellectar and his developments belonged to the company.

6.     Cellectar only learned about this purported assignment (and other assignments coordinated by Weichert) when patents incorporating the relevant intellectual property were issued by the United States Patent and Trademark Office.  Those patents list both Weichert and Pinchuk among the inventors and a third-party assignee as the owner.  The patents erroneously make no mention of Cellectar.

7.      Only much later did Cellectar learn about Weichert's company, Archeus—by that time, the exclusive licensee of these patents.  Having successfully secured the Cellectar intellectual property for his own biotech startup, Weichert's scheme had achieved its goal.

8.      As a result of Defendants' unlawful efforts, patents and publicly filed patent applications reflect inaccurate assignment information and raise questions about the extent of Cellectar's rights, thus potentially impairing the value of promising intellectual property that the company otherwise could seek to further develop.

9.      Yet there can be no legitimate question that these rights belong to Cellectar.  In fact, Pinchuk already has admitted in written, executed, and notarized documents that his contributions to the relevant patents and patent applications always have been owned by Cellectar and that his purported assignment thereof should not have taken place.

10.      Notwithstanding the foregoing, Cellectar has been unable to secure all necessary cooperation to correct the patents and patent applications.  Accordingly, the company has been left with no choice but to pursue recourse in the courts and lift the cloud over its rightful ownership of valuable intellectual property rights.

**THE PARTIES**

11.      Plaintiff Cellectar Biosciences, Inc. is a corporation organized under the laws of Delaware.  The company was originally founded in Madison, Wisconsin in 2000.  The company continued to have its headquarters and/or its research and development team in Madison until 2018, when its principal executive offices were relocated to Florham Park, New Jersey. Thereafter, Cellectar continued to have employees in Madison.

12.      Cellectar is a late-stage clinical biopharmaceutical company focused on the discovery, development, and commercialization of drugs for the treatment of cancer, with an

international intellectual property portfolio and particular focus on delivery platforms for therapeutic and diagnostic agents that selectively target cancer cells as opposed to healthy tissue.

13.     Since 2011, Cellectar has been publicly traded on NASDAQ, and the company has been known by its present name, "Cellectar Biosciences, Inc.," since 2014.

14.     Defendant Jamey Weichert is an individual who, upon information and belief, currently resides in Sun Prairie, Wisconsin.  Weichert co-founded Cellectar and served as the company's Chief Scientific Officer and as a member of the Board of Directors until his abrupt departure in July 2016.  Weichert currently is a professor in the Department of Radiology at the University of Wisconsin School of Medicine and Public Health in Madison, Wisconsin.

15.     At or around the time of his departure from Cellectar, Weichert co-founded Archeus.  Like Cellectar, Archeus has focused its efforts on the development of biotechnology focused on cancer treatment, including specifically the research and use of therapeutic agents that target cancer cells.  Upon information and belief, Archeus is headquartered in Madison, Wisconsin and remains active today, with Weichert as a stockholder, Director, and Chief Scientific Officer.

16.     Defendant Anatoly Pinchuk is an individual who, upon information and belief, currently resides in Fitchburg, Wisconsin.  From 2003 through 2020, Pinchuk was retained by Cellectar as an employee and as a consultant, performing scientific research in both roles.  Upon information and belief, Pinchuk currently is an Assistant Scientist at the Department of Radiology at the University of Wisconsin School of Medicine and Public Health in Madison, Wisconsin (the same department in which Weichert is a professor), holds a position at a private biotechnology company, and further serves as a consultant to Weichert's company, Archeus.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

18.     This Court has personal jurisdiction over Defendants because, *inter alia*, they are residents of the State of Wisconsin and their conduct complained of herein occurred in the State of Wisconsin.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district and, upon information and belief, both Defendants reside in this judicial district.

## FACTS COMMON TO ALL CLAIMS

**Cellectar Is A Leader in Developing Cancer
Radio-Diagnostic and Cancer Radio-Treatment Technologies,
Including Intellectual Property Related to "PLEs" and Chelating Technology**

20.     Since its founding, Cellectar has been on the cutting edge of researching and developing innovative targeted treatments for cancer patients, including the development of proprietary drugs independently and through strategic research collaborations.  Cellectar's key operations and strategic plans span a number of different (though interrelated) fields, including programs concerning radiopharmaceuticals, small molecules, peptides, and nucleic acids.

21.     A core objective of Cellectar is to develop and leverage the company's proprietary Phospholipid Drug Conjugate™ ("**PDC**") delivery platform to create mechanisms that specifically target cancer cells, focusing on molecular targets that make the chemistry of tumor cells different from that of healthy tissue.

22.     By distinguishing and targeting cancer cells, the PDC platform aims to deliver cancer treatment with improved efficacy and safety, which is made possible by reducing off-

target effects (*i.e.*, negatively impacting healthy, non-cancerous tissue) and by administering drug payloads with increased potency for recurrent, hard-to-treat cancers where there is high unmet medical need and limited treatment options.

23.     An important feature of Cellectar's proprietary PDC platform is exploiting the selective uptake and retention of certain biomolecules called phospholipid ethers ("**PLEs**") by malignant cells.  This selective uptake and retention arises from differences between the plasma membranes of cancerous cells and healthy cells.

24.     Cellectar's therapies utilize PLEs as a vehicle to induce cancer cells' uptake of small molecules that have been conjugated with other drugs, isotopes, or compounds to allow for the targeted delivery of chemotherapeutics, radiotherapeutics, and molecular diagnostics.  This selective uptake of conjugated materials is designed to facilitate both cancer diagnoses and treatments, and permit the usage of different drug payloads to develop novel, targeted therapies for a wide array of cancers.

25.     For example, one of Cellectar's current principal efforts relates to a PDC compound called CLR131 (also known as iopofosine), which aims to deliver a radioactive cytotoxic isotope of iodine (iodine-131) directly to cancer cells while limiting exposure to healthy cells.  As Cellectar's current lead therapeutic, CLR131 is in clinical studies in connection with cancers such as Waldenstrom's macroglobulinemia (a form of non-Hodgkin's lymphoma) and multiple myeloma (a cancer that first impacts white blood cells in bone marrow).  Further, the U.S. Food and Drug Administration ("**FDA**") has granted six Orphan Drug and four Rare Pediatric Disease designations for the use of CLR131 in the treatment of certain cancers, as well as three Fast Track designations for the treatment of relapsed or refractory diffuse large B-cell

Lymphoma (a form of non-Hodgkin's lymphoma), multiple myeloma, and Waldenstrom's macroglobulinemia.

26.     One form of synthetic PLE is alkylphosphocholine, which is a synthetic molecule that behaves like naturally occurring phospholipids.  Certain technologies developed and utilized by Cellectar incorporate linking alkylphosphocholine to an intermediate configuration of atoms (such as a phenyl group that has a backbone of six carbon atoms), which in turn is linked to a functional drug or agent that has the desired imaging or therapeutic effect.  The intermediate group is frequently called the "linker," and the functional group at the end of the molecule is frequently referred to as the functional or active "moiety."  The alkylphosphocholine itself is the vehicle that selectively targets the cancer cell and, with the proper linker, delivers the functional moiety to either bind to the cancer cell (acting as a diagnostic or imaging agent if the functional group is radioactive or fluorescent) or treat the cancer (if the functional group is either highly radioactive or otherwise toxic to the cancer cell).

27.     Accordingly, Cellectar's efforts and research necessarily have focused not only on the synthesis of the alkylphosphocholine vehicle, but also of the linker that permits the PLE to operate as a practical and effective delivery system and the functional moiety that offers different diagnostic and therapeutic properties.

28.     One type of functional moiety that provides unique properties is a chelator.  A chelator is a group of atoms that is capable of binding a metal ion in a "cage" that holds the metal ion less firmly than a regular covalent bond and which, under certain conditions, can selectively release the metal ion.  The selective release of metal ions has potentially unique medical applications in PLE technology given the unique way in which a chelator holds and releases metal ions.

29.     Chelators are well understood to have varying affinities and abilities to capture different types of metal ions.  Some chelators capture a variety of different isotopes (at varying degrees of efficiency and stability) while others are more narrowly focused and only effectively capture one isotope.

30.     PDC platforms do not necessarily need to utilize chelators to be effective; for example, Cellectar's CLR131 uses direct covalent bonding to bind the iodine-131.  Nevertheless, the use of chelators has been an important area of research and development for Cellectar and has potential implications for the company's radiopharmaceutical business.  For example, the ability of a chelator to capture ions of certain elements, such as gadolinium or lead, is especially useful in the context of PLE technology because it is not as chemically stable to deliver a radioactive gadolinium or lead moiety which is covalently bonded to the PLE as it is to deliver it via a chelator. The appropriate chelator will have a sufficiently high affinity for the radioisotope, reducing the potential for it to become free and thereby reduce the potential for toxicities.

31.     Moreover, the use of chelators may present other strategic and functional advantages for PDCs for a variety of reasons, including that (1) chelators potentially capture multiple radiopharmaceutical agents, and (2) regulatory bodies, such as the FDA, understand the properties of many chelators and are more likely to approve them for medical uses.

32.     Accordingly, Cellectar has explored the use of chelators in connection with cancer-targeting delivery platforms, including a PDC system referred to as CLR1401, which is structurally similar to CLR131.

33.     Whether related to chelators, radiopharmaceuticals, or otherwise, Cellectar has been at the forefront of several novel oncological breakthroughs.  These continuing achievements require that Cellectar devote substantial resources to research and development

and leverage the creativity and knowledge of its team of scientists and researchers—which included, for many years, Defendants in this action and other individuals who remain connected to Defendants through the University of Wisconsin and/or Weichert's company, Archeus.

34.     Critical to Cellectar's ability to fund its research operations and secure investment is its ownership of the intellectual property that it develops, including the patentable technology that results from its substantial investments, research, and labor.  In that regard, and as detailed below (*infra* at ¶¶ 46-65), Cellectar is careful to ensure that developments by its employees and consultants, as well as developments that spring from the use of Cellectar's intellectual property or resources, are owned by Cellectar and are freely available to the company to enable further scientific progress.

**Weichert and Pinchuk Benefit From**
**<u>Long Tenures and Strategic Responsibilities At Cellectar</u>**

35.     Weichert co-founded Cellectar under the name "Cellectar, Inc." in 2000, and remained with the company following its 2011 acquisition by Novelos Therapeutics, Inc. and the subsequent renaming of the combined company as "Cellectar Biosciences, Inc." in 2014.

36.     For most of his tenure at Cellectar until his departure in July 2016, Weichert held the position of Chief Scientific Officer and had responsibility for overseeing the company's intellectual property operations as well as ensuring that such intellectual property became usable by the company.  Weichert also served on Cellectar's Board of Directors, and in at least 2010, he served as interim President and Chief Executive Officer.

37.     In his various capacities at Cellectar, Weichert regularly directed the research and development efforts of the company's employees and consultants.  Those employees and consultants included but were not limited to co-defendant Pinchuk and a consultant named Wolfgang Tomé ("**Tomé**"), both of whom were involved in the development of the intellectual

property and technology pertinent to this action, and who are listed as inventors on the patents

and patent applications of which Cellectar has been unlawfully deprived of ownership rights.

38.     As a director, Weichert developed, reviewed, and evaluated corporate plans and

objectives; assessed the performance of the company and its senior executives; and directed and

stayed apprised of a variety of business concerns such as developments in delivery mechanisms

for cancer-treating and imaging agents, the financial conditions and relative competitive standing

of Cellectar, and the company's risk profile.

39.     Weichert also maintained connections to other research organizations, including

the University of Wisconsin.  Those connections, however, did not diminish any of Weichert's

obligations to Cellectar as an officer, director, and an employee, including but not limited to his

fiduciary duties and contractual requirements (discussed *infra* at ¶¶ 48-56, 66-69).

40.     Pinchuk began his career at Cellectar on August 1, 2003.  From the time he joined

the company until July 2010, Pinchuk was an employee of Cellectar, holding the title of Senior

Scientist.  In that role, Pinchuk had various research and development responsibilities, including

conceptualizing, overseeing, and reducing to practice chemical synthesis of PLEs and related

compounds.

41.     Although a highly valued and innovative researcher, Pinchuk's employment by

Cellectar was terminated effective July 8, 2010, due to a lack of funding for his position.

42.     On June 22, 2011, Cellectar was able to formally retain Pinchuk as a consultant

with a different compensation structure.

43.     Pinchuk's responsibilities as a consultant were similar to those during his tenure

as a Cellectar employee.  The anticipated scope of his consulting work was expressly set forth in

a June 22, 2011 Consulting Agreement with the company (the "**Pinchuk Consulting**

**Agreement**," attached as Exhibit ("**Ex.**") 1 to this Complaint), and includes the continued work developing PDC and PLE-related technology, including with respect to alkylphosphocholine and chelators:

> The scope of work to be performed under this consulting agreement entails the synthesis, purification and characterization of CLR1400 from 17-Iodoheptadecyl benzoate and its subsequent conversion to CLR1401 at a scale of 10 g by notebook procedures.  All reaction parameters, observations, and results will be recorded in a laboratory notebook assigned to the consultant by the company.  The CLR1401 is intended for use in drug formulation studies and in vivo tumoricidal efficacy evaluation in selected animal tumor models.

(Ex. 1, at Exhibit A.)

44.     Both during his term of employment and his consultancy, Pinchuk's research and development work was regularly supervised and/or guided by Weichert, either through direct communications and instructions to Pinchuk or through intermediaries at the company that supervised Pinchuk, such as Marc Longino, former Director of Chemistry and Drug Formulation at Cellectar ("**Longino**").

45.     Pinchuk continued to serve as a consultant for Cellectar until his abrupt resignation on June 10, 2020.

### Weichert's and Pinchuk's Written Agreements With Cellectar Provide That All Intellectual Property Arising From Their Work for Cellectar Belongs to Cellectar

46.     Cellectar took pains to put in place robust employment and consultancy agreements to ensure, among other things, that it retained its rightful interest in intellectual property developed by employees and consultants, especially given the recognition that some employees and consultants held positions or were otherwise associated with unrelated entities.

47.     Both Weichert's and Pinchuk's tenures with Cellectar thus were governed by formal, written agreements setting forth the terms, obligations, and restrictions of their

employment and consultancy.  Compliance with those terms, obligations, and restrictions were essential and ongoing conditions of their retention.

### *Pinchuk's and Weichert's Employment Agreements*

48.     In connection with their tenures of employment, both Pinchuk and Weichert executed a "Confidentiality, Proprietary Information and Noncompetition Agreement"; Pinchuk's was effective as of August 11, 2003 (the "**Pinchuk Employment Agreement**," attached as Exhibit 2 to this Complaint), and Weichert's was effective as of January 12, 2007 (the "**Weichert Employment Agreement,**" attached as Exhibit 3 to this Complaint).

49.     The terms of the Pinchuk Employment Agreement and Weichert Employment Agreement are the same in all material respects.  Both provide that they are to be governed by, and construed in accordance with, Wisconsin law.  (Ex. 2, § 5.8; Ex. 3, § 5.7.)

50.     Both agreements detail the employees' obligations with respect to any inventions, developments, or other intellectual property generated in connection with their employment or performance of services for Cellectar—more specifically, that *any and all such material must be promptly disclosed and is from the moment of its creation assigned to and owned by Cellectar.*

51.     For example, Section 2.1 of the Pinchuk Employment Agreement provides:

> If at any time or times during and directly in connection with Employee's employment and performance of services for the Company, Employee (either alone or with others) makes, conceives, discovers, reduces to practice or becomes possessed of any Invention (as defined in Section 2.2 of this Agreement) or Work of Authorship (as defined in Section 2.3 of this Agreement), whether or not such Invention or Work of Authorship is patentable or registrable under copyright or similar statutes or subject to analogous protection, *such Invention or Work of Authorship and the benefits thereof shall immediately become the sole and absolute property of the Company. Employee* shall promptly disclose to the Company each such Invention or Work of Authorship and shall assign and *does hereby assign any rights Employee may have or acquire in such Inventions or Works of Authorship and benefits and/or rights resulting therefrom to the Company* without compensation and shall communicate to the Company, without

12

> cost or delay and without publishing the same, all available information relating
> thereto with all necessary plans and models . . . .

(Ex. 2, § 2.1 (emphasis added).)

52.     The parallel provision in Section 2.1 of the Weichert Employment Agreement is virtually identical, but specifies that the foregoing applies also to "times prior to the date of this Agreement," confirming that any innovations by Weichert between the start of his tenure in 2000 and the later execution of his contract in 2007 were subsumed within the assignment and disclosure obligations.  (Ex. 3, § 2.1.)

53.     Both agreements define "Invention" broadly to encompass "any discovery, improvement, idea or creation (whether or not described in writing or reduced to practice, and whether or not patentable) made solely by Employee or by Employee jointly with others, while performing work within the scope of Employee's activities as an employee of the Company and relating to any of the Company's products, processes, engineering, research, equipment, applications, or other activities or investigations."  (Ex. 2, § 2.2; Ex. 3, § 2.2 (referring to "performing services for the Company or providing work within the scope of Employee's activities" instead of "performing work within the scope of Employee's activities").)

54.     Moreover, both agreements required Weichert and Pinchuk to, *inter alia*,:

> execute all such documents, and do all such things as the Company and its duly
> authorized agents may reasonably require to . . . apply for, obtain and vest in the name of
> the Company alone … letters patent, copyrights or other analogous protection in any
> country throughout the world and when so obtained or vested to renew and restore the
> same . . . .

(Ex. 2, § 2.1; Ex. 3, § 2.1.)

55.     Pursuant to the Employment Agreements, both Weichert and Pinchuk agreed to operate in the best interests of Cellectar and protect Cellectar's proprietary information in other ways as well.   For example, and without limitation, both individuals committed to:

13

- Not disclose, and take appropriate steps to protect, Cellectar's "Confidential Information," as that term is broadly defined to encompass materials such as "research activities and plans," "technology," "manufacturing procedures," and "intellectual property" (Ex. 2, §§ 1.2(a), 1.3(a); Ex. 3, §§ 1.2(a), 1.3(a));

- Not disclose or use for their own purposes (or for others' purposes) any "Trade Secrets," as that term is broadly defined to include all information owned, licensed, or otherwise controlled by Cellectar that was "not generally known by others" and "not readily ascertainable by proper means by others who can obtain economic value from the disclosure or use thereof" (Ex. 2, §§ 1.2(b), 1.3(b); Ex. 3, §§ 1.2(b), 1.3(b)); and

- Upon termination of employment for any reason whatsoever, return all Confidential Information, trade secrets, and property to Cellectar, and advise Cellectar of changes in employment for a two year period following the termination (Ex. 2 § 3; Ex. 3, § 4).

56.     Both agreements also contain express "Noncompetition" provisions. For example, both Weichert and Pinchuk agreed, in pertinent part, that during their employment and for a period of two years thereafter, they would not:

(a) . . . become engaged, directly or indirectly, as an employee, independent contractor, consultant, officer, holder of a financial interest . . . or otherwise, in any commercial activity relating to the development, sales or marketing of injectable oncologic radiodiagnostics or injectable oncologic radiotherapeutics, or other products that were developed by the Company at the time of Employee's employment . . . if such activity is in competition with any product developed, under development, sold or marketed by the Company with respect to which either (i) Employee acquired Confidential Information during his employment with the Company, or (ii) Employee was involved in sales or marketing activities on behalf of the Company.

(b) . . . induce, attempt to induce, or assist any other person or entity in inducing or attempting to induce, any of the Company's employees or consultants to terminate their relationship with the Company.

(Ex. 2, § 4(a)-(b); Ex. 3, § 3(a)-(b).)

*Pinchuk's Consulting Agreement*

57.     When Pinchuk rejoined Cellectar as a consultant in 2011, he executed a separate Consulting Agreement that set forth the scope of his anticipated work and services for the company (as discussed above), and that set forth requirements with respect to intellectual

property assignment, confidentiality, and other terms similar to those that were encompassed within his prior Employment Agreement.

58.     The Pinchuk Consulting Agreement provides that it is to be governed by, and construed in accordance with, Massachusetts law.  (Ex. 1, § 9(h).)

59.     As in his prior contract, Pinchuk once again agreed that any and all developments and intellectual property arising in any way out of the work that he was doing for Cellectar—in any form, and whether done on his own or alongside others—was the sole property of Cellectar:

> Consultant agrees that ***all discoveries, developments, inventions, ideas, concepts, research and other information, processes, products, methods and improvements or parts thereof***, whether or not patentable or subject to copyright protection or other forms of proprietary protection, however denominated, and whether or not reduced to tangible form, memorialized or reduced to practice, that are written, conceived, developed, reduced to practice or otherwise made by Consultant, whether alone or jointly with others, in the course of, relating to or arising out of any of the Work (hereinafter collectively referred to as the "Developments") ***shall be the sole property of the Company***.
>
> *           *           *
>
> ***Consultant agrees to and hereby does, assign, to the Company all of Consultant's right, title and interest throughout the world in all Developments and to anything tangible which evidences, incorporates, constitutes, represents, memorializes, embodies, performs, displays or records any such Development***. Consultant hereby assigns and, to the extent any such assignment cannot be made at present, Consultant hereby agrees to assign to the Company all copyrights, patents, trademarks and other proprietary rights, however denominated, Consultant may have in any such Developments, together with the right to file for or own wholly without restriction United States and foreign copyrights, patents, trademarks and other proprietary rights, however denominated, with respect thereto.

(Ex. 1, § 4(a), (c) (emphasis added).)

60.     Similarly, Pinchuk once again agreed that he would assist Cellectar "in every reasonable manner" to obtain formal intellectual property protections (*e.g.*, patents, copyrights) "for the Company's benefit," including executing all necessary applications, registrations or

other documents, and taking all other actions for Cellectar to secure such protections.  (Ex. 1, § 4(e).)

61.     Pinchuk committed to continue operating in the best interests of Cellectar at all times, and to protect Cellectar's proprietary information.  For example, and without limitation, Pinchuk agreed that he would keep "Confidential Information" (again, broadly defined) as "strictly confidential" and use it only as necessary to conduct his work for Cellectar's sole benefit.  (Ex. 1, § 5(b).)

62.     Pinchuk also acknowledged not only that he would disclose to Cellectar any potential "conflicts of interest," but further that he "shall recognize and avoid any situation that might involve a conflict of interest, including, without limitation, performing any portion of the Work during [his] normal working hours for, or by using any of the equipment or facilities of, any other person or entity with which Consultant has a consulting or employment relationship." (Ex. 1, § 3(a).)  This provision was of particular importance given that Pinchuk, like other Cellectar personnel, had certain affiliations, and conducted research in connection, with the University of Wisconsin – Madison.

63.     For the same reasons, critical to the Pinchuk Consulting Agreement was Pinchuk's express representation and warranty that he was:

> not subject to, and **shall not in the future enter into, any contract or agreement** with any person, corporation, government agency or other entity **that could, in any manner, impede or prevent Consultant from giving, and the Company from receiving, the benefit of the Work** to be performed under this Agreement.

(Ex. 1, § 3(b) (emphasis added).)

64.     Pinchuk also reaffirmed noncompetition provisions akin to those to which he agreed when he was a Cellectar employee.  For example, during his consultancy and for one year thereafter, Pinchuk was barred from providing, in any capacity, any services "which are

substantially similar to the services" that he was providing to Cellectar to any person or entity "in competition with" Cellectar, that "intends at any time to compete with" Cellectar, or that "otherwise provides products or services similar to" those that were "provided or proposed to be provided" by Cellectar.  (Ex. 1., § 6(a).)

65.     In sum, the provisions in the Pinchuk Consulting Agreement and the two Employment Agreements made express and unequivocal the understanding that Cellectar was entitled to receive the fruits of Pinchuk's and Weichert's work for the company, and there were numerous contractual restrictions on both individuals' ability to transfer the benefits of that work to other organizations, including potential competitors.  Certainly, both defendants well understood that Cellectar could not be *deprived* of those benefits.

### *Weichert's Obligations and Duties As A Director and Officer of Cellectar*

66.     Weichert's duties to Cellectar stemmed not only from his position and contract with the company as an employee, but also from his roles as Chief Scientific Officer, a member of the Board of Directors, and interim President and Chief Executive Officer of the company.

67.     Under Wisconsin law, Weichert owed a fiduciary duty of loyalty, good faith, and fair dealing in the conduct of corporate business.  Accordingly, Weichert was prohibited from exploiting his position of trust with Cellectar for personal gain where the benefit or gain properly belonged to Cellectar.  Weichert also would owe such fiduciary duties under the laws of Delaware (where Cellectar is currently incorporated).

68.     Furthermore, Weichert's and Pinchuk's ethical duties to the company were expressed in Cellectar's organizational documents.  For example, Cellectar's Code of Ethics explains that the company's employees, officers, and directors are "prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property,

information or position without the consent of the Board of Directors." Furthermore, no employee "may use corporate property, information, or position for improper personal gain" or "compete with the Company directly or indirectly." The Code of Ethics also specifies that "employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises."

69. Separate and apart from their employment and consulting contracts, both Defendants executed documents expressly acknowledging and agreeing to comply with the foregoing duties and obligations in the Code of Ethics.

**Under Weichert's Direction, Pinchuk Develops the Patented Chelators**

70. Both as an employee and as a consultant for Cellectar, and under the supervision and direction of Weichert, Pinchuk developed the synthesis of the later-patented chelating compounds.

71. Pinchuk apparently first conceived of this synthesis and reduced it to writing in a January 21, 2010 document prepared by Pinchuk for Cellectar in the course of his employment entitled "Chemistry Plans for 2010 and Beyond" (the "**Chemistry Plan**").

72. The Chemistry Plan more specifically refers to the use of Cellectar's CLR1401 delivery platform as a carrier for therapeutic and imaging agents targeting cancer cells and envisions the use of chelators, including dodecane tetraacetic acid ("**DOTA**," also known as tetraxetan), to bind alkylphosphocholines to therapeutic isotopes such as iodine or gadolinium. Generally speaking, DOTA was a known chelator that binds to a variety of different isotopes.

73. Pinchuk wrote in the Chemistry Plan that synthesis of necessary compounds would require development of an "amination procedure" for CLR1401—that is, replacement of

an iodine atom in CLR1401 with an amino group that would enable attachment of a chelating moiety.

74.    Pinchuk's employment was terminated several months after preparation of the Chemistry Plan, but he returned to his work developing the relevant syntheses under Weichert's direction following his retention by Cellectar as a consultant.

75.    As noted above (*supra* at ¶ 43), the Pinchuk Consulting Agreement set forth the scope of Pinchuk's work for Cellectar as including "the synthesis, purification and characterization of CLR1400 from 17-Iodoheptadecyl benzoate and its subsequent conversion to CLR1401 at a scale of 10 g by notebook procedures."  CLR1401 is the alkylphosphocholine discussed in the Chemistry Plan for its uses as a carrier for therapeutic and imaging agents when linked to a DOTA moiety.

76.    By 2014, Pinchuk's efforts to develop the amination procedures that would allow Cellectar to replace the iodine at the end of its PLE analog with a chelator to capture radioisotope moieties were proving successful.

77.    Once again, Pinchuk's efforts on behalf of the company were documented in materials retained by Cellectar.  Several of Pinchuk's laboratory notebooks, dated between February 2014 and October 2014 (the "**Chemistry Notebooks**"), detail his conception of an amination procedure for use on CLR1401 that would allow the alkylphosphocholine to be bound to other moieties, a necessary step in synthesizing therapeutic and diagnostic compounds.

78.    The procedure detailed in the Chemistry Notebooks concerned utilization of a compound known as COMU to facilitate amination.  COMU ($C_{12}H_{19}F_6N_4O_4P$) is a third-party proprietary peptide recoupling agent that Pinchuk believed could replace the less effective methylated solvent-based amination procedure he had previously tried.

79.     This concept proved the most successful method of linking PLEs to multiple other moieties, including cytotoxins and fluorescent agents.  Pinchuk thoroughly documented his use of COMU for this process in the Chemistry Notebooks.

80.     Once Pinchuk successfully used the COMU synthesis for other moieties, he used it to facilitate synthesis of PLE-DOTA chelators as well as other chelators claimed in the patent filings.  These developments occurred during Pinchuk's consultancy and gave rise to the methods necessary to link the Cellectar's PLEs to DOTA on which the subsequent patent applications relied.

81.     Pursuant to the express terms of his Employment Agreement and his Consulting Agreement, all of Pinchuk's concepts, discoveries, developments, inventions, processes, methods, and other information related to or reflected in the Chemistry Plan or the Chemistry Notebooks (collectively, the "**Cellectar IP**") were the sole property of Cellectar upon their creation.

82.     The Chemistry Plan and the Chemistry Notebooks—and the Cellectar IP contained therein—therefore are and always have been Cellectar's property, and have remained in Cellectar's possession to this day.

83.     Throughout the development of the Cellectar IP, Pinchuk worked under and at the direction of Weichert, who had been (i) supervising and researching the development of methods used in linking alkylphosphocholines to imaging and therapeutic agents for the purposes of creating cancer cell-targeting molecules, and (ii) designated to "lead [the] effort" and be the "point person" with respect to certain aspects of Cellectar's PLE development program, including developing an alternative to a radioiodinated version of the CLR1401 moiety described in the Chemistry Plan.

20

84.     Weichert therefore exerted influence in directing the scope and objectives of Pinchuk's research into the Cellectar IP as it evolved over time, such as the development of uses for the CLR1401 moiety described in the Chemistry Plan, conception of the chelated structures and their syntheses, and the development of new alkylphosphocholine molecules termed CLR1404, CLR1502, and CLR1601.  In particular, the synthesis of CLR1502 and CLR1601 was made possible only by Pinchuk's conception of the COMU-based amination procedure detailed in the Chemistry Notebooks.

85.     Pinchuk routinely reported to Weichert to disclose his findings and progress on the Cellectar IP.

### Notwithstanding His Duties and Obligations to Cellectar, Weichert Obscures The Successful Development of the Cellectar IP and Implements A Plan to Steer The Cellectar IP Away From The Company For His Own Benefit

86.     Weichert understood the potential and promise of the Cellectar IP and thus, unbeknownst to other Cellectar directors and senior management, began taking steps to purloin the Cellectar IP for his own benefit.  More specifically, Weichert set in motion a plan to divert the rights to utilize the Cellectar IP to his own biotechnology startup, Archeus.

87.     Weichert intentionally shielded developments in the Cellectar IP from other Cellectar officers and directors, including by engaging in communications with respect to the Cellectar IP and his subsequent plans for that IP outside of Cellectar email servers and other company channels—*e.g.*, on personal email accounts.

88.     For example, in a 2015 email concerning a research development related to the alkylphosphocholine-based analog Gadolinium-404—a chelator synthesized via the COMU amination procedure developed by Pinchuk—Weichert directed Longino (Pinchuk's direct supervisor with respect to the Cellectar IP) to "[k]eep this quiet," and mandated that "[t]his one

goes through WARF." "WARF" is the Wisconsin Alumni Research Foundation, with which Cellectar and/or its researchers have collaborated in the past, and which is the purported assignee of the patents incorporating the Cellectar IP at issue in this litigation.

89.     Part and parcel of Weichert's efforts to divert the Cellectar IP from Cellectar were steps taken to coordinate the surreptitious filing of patent applications containing the Cellectar IP through WARF and its counsel.

90.     On November 6, 2015, while still employed at Cellectar (but without informing the company), Weichert facilitated WARF's submission of a provisional patent application with the U.S. Patent and Trademark Office, bearing Application Number 62/252,218.  The application was titled "Long-Lived Gadolinium Based Tumor Targeted Imaging and Therapy Agents," and listed Weichert, Pinchuk, and Tomé—at that time a Cellectar consultant whom Weichert was also supervising—as inventors.

91.     The application described methods of synthesizing chelators comprising gadolinium atoms and alkylphosphocholines to create compounds with therapeutic or diagnostic capabilities that selectively target cancerous tumor cells.  DOTA was specifically identified as a useful chelator, and the application further discussed syntheses for binding a DOTA moiety to alkylphosphocholine—namely, the amination procedure utilizing COMU, as conceptualized by Pinchuk and recorded in the Chemistry Plan and Chemistry Notebooks.

92.     Upon information and belief, Weichert intentionally and surreptitiously directed that this provisional application be filed at this time, in part to claim a priority date that would predate the impending publication of certain Cellectar patents incorporating the same amination procedure.

93.     On July 15, 2016, Weichert resigned from Cellectar.  Notwithstanding his
contractual and fiduciary duties—including to return materials to Cellectar and not utilize
Cellectar's developments and information for his own benefit—Weichert retained confidential
company materials relating to the Cellectar IP after his departure.

94.     Less than two weeks after his resignation, on July 28, 2016, Weichert executed a
written assignment purporting to assign his interests in the 2015 provisional patent application
and all future applications covering all or part of the same subject matter to WARF.

95.     On July 27, 2016—one day before Weichert's assignment—Pinchuk executed a
written assignment purporting to assign his interests in the same application to WARF.

96.     Insofar as Tomé, the third of the three inventors listed in the patent application,
had assigned his interest to WARF only one week after the original filing in November 2015, the
full ownership of the patent application, and any corresponding future applications, was
purported to be assigned to WARF.

97.     Upon information and belief, because he knew that at minimum both his and
Pinchuk's purported interests in the patent application actually belonged to Cellectar, Weichert
intentionally delayed executing the assignment agreements with WARF until after his
resignation from Cellectar, and further ensured that Pinchuk's assignment would not take place
until after such resignation.

98.     Upon information and belief, following his departure, Weichert continued to
guide Pinchuk and others at Cellectar—including Tomé and Longino—in developing the
Cellectar IP and steering it away from Cellectar toward WARF.  Weichert also continued to
provide WARF with inaccurate information and invalid assignments in support of additional

filings with the United States Patent and Trademark Office, all of which listed WARF as assignee.

99.     For example, on November 4, 2016, a corresponding nonprovisional patent application for the 2015 provisional application was filed by WARF, bearing Application Number 15/343,580.  This nonprovisional application once again was premised on the invalid assignment of at least Weichert's and Pinchuk's interests to WARF.

100.     Patent protection for this nonprovisional application was eventually issued on April 23, 2019, under U.S. Patent Number 10,265,398 (hereinafter referred to as the "'**398 Patent**").  As issued, the '398 Patent discloses and claims the same Cellectar IP described in the 2015 provisional application.

101.     After the '398 Patent application was filed, WARF, relying on the improper assignment of rights by the Defendants, continued to file applications covering the same subject matter (collectively, "**the '398 References**"), all of which disclose the same Cellectar IP as the '398 Patent and claim priority to the 2015 provisional application.  These references include U.S. Application Number 16/285,358 (granted under U.S. Patent Number 10,813,998); U.S. Application Number 17/032,132 (published under Publication Number 2021-0008203); and World Intellectual Property Organization ("WIPO") international application number PCT/US2016/060491.

102.     Weichert also facilitated the July 25, 2016 filing of another provisional patent application containing claims similar to those described in the '398 References and describing chelation of various radioactive metal isotopes not including gadolinium.  That application, bearing Application Number 62/366,344, was entitled "Radioactive Phospholipid Metal Chelates

for Cancer Imaging and Therapy," and listed Weichert, Pinchuk, and a third individual, Reinier Hernandez ("**Hernandez**"), as inventors.

103.    Upon information and belief, Hernandez is an Assistant Professor in the Department of Medical Physics at the University of Wisconsin – Madison and, like Weichert, has an equity interest in Archeus.

104.    Defendants also diverted their purported rights in this patent application to WARF.  At the same time as they executed the assignment agreement for the '398 Patent application (July 28, 2016 and July 27, 2016, respectively), Weichert and Pinchuk executed another assignment to WARF covering Provisional Application Number 62/366,344 and its progeny, which was filed with the United States Patent and Trademark Office.  Hernandez assigned his interests in the same applications to WARF on March 22, 2019.

105.    Relying on these improper assignments, WARF continued to file additional patent applications claiming priority to the 2016 provisional application.  These references include U.S. Application Number 15/343,604 (published under Publication Number 2018-0022768); U.S. Application Number 16/891,181 (published under Publication Number 2020-0291049); and WIPO international application number PCT/US2016/060495.

106.    All of the aforementioned patent submissions concerning Cellectar IP and described in Paragraphs 90 through 105 of this Complaint are hereinafter collectively referred to as the "**Subject Patents**," and each of the Subject Patents incorporates the subject matter that was unlawfully diverted away from Cellectar by Weichert for his personal gain.

## Weichert Secures A License To The Cellectar IP For His Own Company, Archeus

107.     No later than two months after his departure from Cellectar and a few weeks after he and Pinchuk purported to assign their interest in the Cellectar IP to WARF, Weichert co-founded Archeus along with another former employee and director of Cellectar, J. Patrick Genn.

108.     Public records indicate that Archeus was formally incorporated on September 2, 2016.  Upon information and belief, Archeus already had existed for some time before its incorporation.

109.     Archeus, like Cellectar, is focused on the research and development of cancer therapeutics.  Upon information and belief, Archeus's focus has been on small molecule therapeutics, including PLE technology, primarily surrounding methods of chelating the alkylphosphocholine NM600 to therapeutic isotopes.

110.     Despite the distinct similarities between the technology being developed by Archeus and the Cellectar IP, and the potential for Archeus to compete with Cellectar in the field of cancer imaging and therapeutics, Weichert did not disclose the existence of Archeus or its operations to Cellectar at any time during or after his tenure with the company.

111.     Publicly available materials indicate that Archeus has licensed the Subject Patents from WARF, completing the circle of Weichert's self-dealing and the diversion of Cellectar's intellectual property rights for his own benefit.  For example:

- In testimony given before the Wisconsin Senate in January 2018, Weichert explained that Archeus "has licensed four of our own UW patents from WARF dealing with unique molecules capable of enabling the body's own immune system to kill cancer cells in a vaccine memory sense."[1]

---

[1] Weichert, Jamey, "Testimony for Senate Bill SB 671" (Jan. 24, 2018), available at https://profs.wisc.edu/wp-content/uploads/2018/01/Weichert-testimony.pdf.

- A scientific article co-authored by Weichert and published in the November 2019 Journal of Nuclear Medicine discloses that Archeus "owns the rights to the alkylphosphocholine chelates discussed herein."[2]

- A scientific article in the July 2021 Journal of Nuclear Medicine co-authored by Weichert and another inventor listed on one of the Subject Patents describes the titular moieties as being chelated to the tumor-targeting alkylphosphocholine NM600 through DOTA-based methods for PET imaging purposes, and discloses that Archeus has licensing rights to the NM600 used in the described experiments.[3]

112.    Upon information and belief, Archeus's licenses to the Subject Patents and the Cellectar IP incorporated therein are purported to be exclusive, and Archeus continues to exploit the Cellectar IP and the Subject Patents as part of its research and development.

113.    In addition, Archeus has continued to exploit Pinchuk's knowledge and contributions to the Cellectar IP.  Notably, Pinchuk resigned from Cellectar on June 10, 2020, but only two months later, in an article in the August 2020 issue of the Journal of Nuclear Medicine, Pinchuk is disclosed as a "consultant" to Archeus.[4]

114.    Pinchuk never disclosed to Cellectar any consulting (or other) arrangement with Archeus.  Moreover, upon information and belief, Pinchuk retained confidential materials relating to the Cellectar IP after his departure from Cellectar despite his contractual and other commitments not to do so.

---

[2] Grudzinski et al., "Preclinical Characterization of 86/90Y-NM600 in a Variety of Murine and Human Cancer Tumor Models," J. Nucl. Med. (Nov. 2019), available at https://jnm.snmjournals.org/content/60/11/1622.long.

[3] Aluicio-Sarduy et al., "Cyclotron-Produced $^{132}$La as a PET Imaging Surrogate for Therapeutic $^{225}$Ac," J Nucl. Med. (Jul. 2021), available at https://pubmed.ncbi.nlm.nih.gov/33127622/.

[4] Hernandez et al., "$^{177}$Lu-NM600 Targeted Radionuclide Therapy Extends Survival in Syngeneic Murine Models of Triple-Negative Breast Cancer," J. Nucl. Med. (Aug. 2020), available at https://jnm.snmjournals.org/content/jnumed/61/8/1187.full.pdf.

**Pinchuk Admits That The Cellectar IP Belongs to
Cellectar And Should Not Have Been Assigned to WARF**

115. Cellectar did not learn of Weichert's scheme and the attempted misappropriation of its intellectual property until well after Weichert departed the company, as the patent applications for the Subject Patents were not available to the public at that time, and neither Weichert nor Pinchuk disclosed any relevant information to the company.

116. Upon discovery of the early Subject Patents in Summer 2019, Cellectar took steps to try to ensure that the public record would be corrected, and that Cellectar's ownership interest in the Cellectar IP—and its co-ownership of the Subject Patents—would be recognized. Insofar as not all of those efforts were successful, the present lawsuit became necessary.

117. Among Cellectar's efforts was to engage in discussions with WARF and Pinchuk.

118. After being shown the Chemistry Plan as part of those discussions, Pinchuk acknowledged that his work in connection with the Cellectar IP was performed on behalf of Cellectar.

119. Accordingly, at a June 2020 meeting with Cellectar's Chief Business Officer (who appeared remotely by video) and Cellectar's Director of Finance (who was with Pinchuk in person), Pinchuk executed a "Reversion Assignment of Intellectual Property Rights" and an "Assignment." Those two documents included Pinchuk's express acknowledgments and representations that his contributions to the Cellectar IP and/or the Subject Patents were made in the course of his performance at Cellectar, and not in the course of any responsibilities that he may have had conducting research at the University of Wisconsin during that time.

120. Pinchuk further acknowledged in the agreements that he was contractually obligated to have assigned the foregoing contributions to Cellectar.

121.    Insofar as Pinchuk's invalid assignments to WARF had been recorded with the United States Patent and Trademark Office, the goal of the documents was to efficiently correct the public record to acknowledge and confirm Cellectar's ownership interest in the Cellectar IP and/or Subject Patents.  To that end:  (i) Pinchuk would confirm that the Cellectar IP should have been assigned to Cellectar, (ii) WARF would therefore "assign back" to Pinchuk those rights that it was incorrectly purported to have been granted, (iii) Pinchuk would "assign back" those rights to Cellectar, and (iv) the parties would cooperate to correct the public record.

122.    Both of these documents were executed by both Cellectar and Pinchuk, and notarized by a Notary Public of the State of Wisconsin.  The notary statement confirms that Pinchuk "acknowledged that said instrument was signed and delivered as the free and voluntary act of Anatoly Pinchuk, for the uses and purposes therein set forth."

123.    Despite that acknowledgment, Pinchuk subsequently claimed, without justification, that he executed the agreements under "duress," and therefore he purported to rescind his admissions.  Subsequently, WARF did not agree to execute the Reversion Assignment document and made clear that it viewed the dispute as between Cellectar and Pinchuk.

124.    Upon information and belief, Pinchuk made the statement concerning supposed "duress" only after being pressured or persuaded by Weichert to rescind the admissions.

### Cellectar Suffers Ongoing Irreparable Harm

125.    Due to Defendants' conduct, Cellectar has been (and is continuing to be) wrongfully deprived of its ownership interest in the Cellectar IP and Subject Patents, revenue associated with the license and commercialization of those patents, and the goodwill and renown associated with the development of those patents.

126.    Although Cellectar's ownership of the Cellectar IP is straightforward and should be absolutely clear, Defendants' conduct has created a cloud over that ownership.

127.    At a bare minimum, Cellectar is a rightful owner of an undivided interest in the Subject Patents, entitled to exploit the intellectual property set forth therein in connection with its own research, development, and commercialization in the field of radiopharmaceuticals.  Yet as long as the public record shows WARF as the sole owner of the Subject Patents, and Archeus and/or Defendants claim to have exclusive rights to utilize the technology covered by the Subject Patents, Cellectar faces a wrongful threat of infringement litigation if it attempts to utilize that intellectual property.

128.    Moreover, insofar as certain patent applications incorporating the Cellectar IP remain pending, Defendants' wrongful acts have divested Cellectar of the ability to control prosecution of those applications and pursue claims of its choosing, while also creating the risk that such applications might constitute prior art that would interfere with Cellectar's ability to pursue other applications.

129.    Although not essential to all areas of Cellectar's business and existing product pipelines, the Cellectar IP is exciting and promising technology with the potential to yield tremendous benefits in the future across a broad variety of medical applications, and is important to the further expansion of Cellectar's portfolio.  For example, the use of the chelating technology in connection with radioisotopic delivery platforms can increase the potential applications and/or efficacy of those platforms.

130.    As previously noted, as a research and development company, Cellectar's ability to control and exploit the breakthroughs and developments discovered on the company's "watch" is central to its business.  Directors, officers, employees, and consultants cannot simply disregard

their express agreements that those breakthroughs and developments belong to Cellectar, and when such individuals purport to do so, it impacts Cellectar's ongoing mission to provide cutting-edge cancer treatments with exceptional efficacy and safety profiles.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract (Against Weichert): Weichert Employment Agreement

131.    Cellectar realleges and incorporates by reference Paragraphs 1-130 and 143-177 as if fully set forth herein.

132.    The January 12, 2007 Weichert Employment Agreement is a valid and enforceable contract governed by Wisconsin law, and its terms were binding on Weichert both during and following his tenure with Cellectar.

133.    Cellectar has complied with the terms of the Weichert Employment Agreement and all of Cellectar's obligations thereunder.

134.    Under the terms of the Weichert Employment Agreement, any and all discoveries, ideas, and creations (whether or not described in writing or reduced to practice, and whether or not patentable), and intellectual property pertaining thereto, that Weichert, either alone or with others, made, conceived, discovered, reduced to practice or came into possession of in connection with his employment and performance of services for Cellectar, are the sole and absolute property of Cellectar.

135.    Accordingly, any and all of Weichert's contributions to the Cellectar IP were assigned to, and are owned by, Cellectar.

136.    Notwithstanding the foregoing, in clear contravention of the express terms of the Weichert Employment Agreement, Weichert, among other unlawful conduct:  failed to disclose his contributions to the Cellectar IP; retained confidential information relating to the Cellectar IP

following the termination of his employment; purported to assign his contributions to the Cellectar IP to WARF; facilitated the purported assignment of Pinchuk's contributions to the Cellectar IP; induced WARF to secure the Subject Patents concerning the Cellectar IP that list inaccurate ownership information; concealed applications and plans with respect to the Subject Patents from Cellectar; secured an exclusive license in connection with such patents for his own competitive biotech company, Archeus; and attempted to deprive Cellectar of its indisputable rights and benefits stemming from the Cellectar IP.

137.    In so doing, Weichert breached several other terms of the Weichert Employment Agreement aside from the intellectual property assignment terms, including but not limited to provisions requiring that Weichert:  (i) take appropriate steps to ensure that patents or analogous protections are obtained for and vest in the name of Cellectar; (ii) maintain the confidentiality of the company's Confidential Information; (iii) return all Confidential Information and other Cellectar property to Cellectar upon termination of his employment; and (iv) during his employment and for two years thereafter, not become engaged in certain competitive and other commercial activities.

138.    Additionally, upon information and belief, Weichert breached the Weichert Employment Agreement by facilitating and/or inducing Pinchuk to leave Cellectar and pressuring Pinchuk to withdraw his written and signed admission that the Cellectar IP belongs to Cellectar, all in support of Weichert's scheme to misappropriate the Cellectar IP and to ensure that Pinchuk would become a consultant to Archeus.

139.    Weichert's conduct was at all times premeditated and designed to advantage himself and/or commercial entities with which he is affiliated (namely, Archeus) at the expense of Cellectar.

140.    The Weichert Employment Agreement sets forth Weichert's express agreement that because "irreparable injury may result to [Cellectar] in the event of a breach or violation . . . injunctive relief is an appropriate remedy in the event of his breach or violation of any provision" of the contract, "without prejudice to any other right of action which may accrue to [Cellectar] by reason of the breach or violation."  (Ex. 3, § 5.2.)

141.    The Weichert Employment Agreement further provides that, if Cellectar "prevails substantially on the merits" of a litigation concerning an alleged breach or violation of the agreement, it "shall be awarded any and all expenses, including reasonable attorneys' fees and expenses" incurred in enforcing the contract.  (*Id.*)

142.    As a result of Weichert's breach of his contractual obligations, Cellectar has suffered monetary damages and irreparable harm, and is entitled to monetary relief, injunctive relief, and reasonable attorneys' fees and expenses.

### COUNT II
### Breach of Contract (Against Pinchuk): Pinchuk Employment Agreement

143.    Cellectar realleges and incorporates by reference Paragraphs 1-142 and 154-177 as if fully set forth herein.

144.    The August 11, 2003 Pinchuk Employment Agreement is a valid and enforceable contract governed by Wisconsin law, and its terms were binding on Pinchuk both during and following his tenure with Cellectar.

145.    Cellectar has complied with the terms of the Pinchuk Employment Agreement and all of Cellectar's obligations thereunder.

146.    Under the terms of the Pinchuk Employment Agreement, any and all discoveries, ideas, and creations (whether or not described in writing or reduced to practice, and whether or not patentable), and intellectual property pertaining thereto, that Pinchuk, either alone or with

33

others, made, conceived, discovered, reduced to practice or came into possession of in connection with his employment and performance of services for Cellectar, are the sole and absolute property of Cellectar.

147.   Accordingly—and as Pinchuk already has admitted in the signed reversion and assignment documents—any and all of Pinchuk's contributions to the Cellectar IP were assigned to, and are owned by, Cellectar.

148.   Notwithstanding the foregoing, in clear contravention of the express terms of the Pinchuk Employment Agreement, Pinchuk, among other unlawful conduct:  failed to disclose his contributions to the Cellectar IP; retained confidential information relating to the Cellectar IP following the termination of his employment; purported to assign his contributions to the Cellectar IP to WARF; facilitated WARF's securing of the Subject Patents concerning the Cellectar IP that list inaccurate ownership information; concealed applications and plans with respect to the Subject Patents from Cellectar; attempted to deprive Cellectar of its indisputable rights and benefits stemming from the Cellectar IP; and obstructed Cellectar's attempts to lift the cloud over the ownership of the patents by purporting to rescind his written, signed admission that the Cellectar IP belongs to Cellectar and should not have been assigned to WARF.

149.   In so doing, Pinchuk breached several other terms of the Pinchuk Employment Agreement aside from the intellectual property assignment terms, including but not limited to provisions requiring that Pinchuk:  (i) take appropriate steps to ensure that patents or analogous protections are obtained for and vest in the name of Cellectar; (ii) maintain the confidentiality of the company's Confidential Information; (iii) return all Confidential Information and other Cellectar property to Cellectar upon termination of his employment; and (iv) during his

employment and for two years thereafter, not become engaged in certain competitive and other commercial activities.

150.    Upon information and belief, Pinchuk's conduct was facilitated by, and/or done at the direction of Weichert, principally for the benefit of himself and/or Pinchuk, but, in any event at the expense of Cellectar.

151.    The Pinchuk Employment Agreement sets forth Pinchuk's express agreement that because "irreparable injury may result to [Cellectar] in the event of a breach or violation of the provisions of this Agreement . . . injunctive relief is an appropriate remedy in the event of his breach or violation of" certain terms of the contract, including confidentiality and noncompetition-related terms, "without prejudice to any other right of action which may accrue to [Cellectar] by reason of the breach or violation."  (Ex. 2, § 5.2.)

152.    The Pinchuk Employment Agreement further provides that if Cellectar "prevails substantially on the merits" of a litigation concerning an alleged breach or violation of the agreement, Pinchuk is "liable to [Cellectar] for any and all expenses, including reasonable attorneys' fees and expenses" incurred in enforcing the contract.  (*Id.*)

153.    As a result of Pinchuk's breach of his contractual obligations, Cellectar has suffered monetary damages and irreparable harm, and is entitled to monetary relief, injunctive relief, and reasonable attorneys' fees and expenses.

**COUNT III**
**Breach of Contract (Against Pinchuk): Pinchuk Consulting Agreement**

154.    Cellectar realleges and incorporates by reference Paragraphs 1-153 and 165-177 as if fully set forth herein.

155.    The June 22, 2011 Pinchuk Consulting Agreement is a valid and enforceable contract governed by Massachusetts law, and its terms were binding on Pinchuk both during and following his tenure with Cellectar.

156.    Cellectar has complied with the terms of the Pinchuk Consulting Agreement and all of Cellectar's obligations thereunder.

157.    Under the terms of the Pinchuk Consulting Agreement, any and all discoveries, developments, inventions, ideas, concepts, research and other information (whether or not written or reduced to practice, and whether or not patentable), and intellectual property pertaining thereto, that Pinchuk, either alone or with others, conceived, developed, discovered, reduced to practice or otherwise made relating to or arising out of any of his work for Cellectar, are the sole property of Cellectar.

158.    Accordingly—and as Pinchuk already has admitted in the signed reversion and assignment documents —any and all of Pinchuk's contributions to the Cellectar IP were assigned to, and are owned by, Cellectar.

159.    Notwithstanding the foregoing, in clear contravention of the express terms of the Pinchuk Consulting Agreement, Pinchuk, among other unlawful conduct:  failed to disclose his contributions to the Cellectar IP; retained confidential information relating to the Cellectar IP following the termination of his employment; purported to assign his contributions to the Cellectar IP to WARF; facilitated WARF's securing of the Subject Patents concerning the Cellectar IP that list inaccurate ownership information; concealed applications and plans with respect to the Subject Patents from Cellectar; attempted to deprive Cellectar of its indisputable rights and benefits stemming from the Cellectar IP; and obstructed Cellectar's attempts to lift the

cloud over the ownership of the patents by purporting to rescind his written, signed admission that the Cellectar IP belongs to Cellectar and should not have been assigned to WARF.

160.    In so doing, Pinchuk breached several other terms of the Pinchuk Employment Agreement aside from the intellectual property assignment terms, including but not limited to provisions requiring that Pinchuk:  (i) assist "in every reasonable manner" to ensure that patents or analogous protections are secured for Cellectar; (ii) maintain the confidentiality of the company's Confidential Information; (iii) recognize and avoid any situations that may involve a conflict of interest; and (iv) not enter into any agreements that could, in any manner, impede or prevent him from giving Cellectar the benefit of his work.

161.    Additionally, by joining Archeus as a consultant, Pinchuk breached the provision of the Pinchuk Consulting Agreement ensuring that he would not, during his consultancy and for a year thereafter, provide any services "substantially similar" to those he provided to Cellectar.

162.    Upon information and belief, Pinchuk's conduct was facilitated by, and/or done at the direction of, Weichert, principally for the benefit of himself and/or Pinchuk but at the expense of Cellectar.

163.    The Pinchuk Consulting Agreement sets forth Pinchuk's express agreement that because "money damages alone shall not adequately compensate [Cellectar] for breach of" Pinchuk's obligations under the intellectual property assignment, confidentiality, and noncompetition provisions of the agreement, Cellectar "shall be entitled to injunctive relief" to ensure compliance with those provisions "in addition to all other remedies available to the Company."  (Ex. 1, § 9(f).)

164.     As a result of Pinchuk's breach of his contractual obligations, Cellectar has suffered monetary damages and irreparable harm, and is entitled to monetary and injunctive relief.

## COUNT IV
### Breach of Fiduciary Duty (Against Weichert)

165.     Cellectar realleges and incorporates by reference Paragraphs 1-164 and 171-177 as if fully set forth herein.

166.     Weichert owed a fiduciary duty of good faith, fair dealing, and loyalty to Cellectar by virtue of his role as Chief Scientific Officer, his membership on Cellectar's Board of Directors, and his interim position as President and Chief Executive Officer of the company.

167.     All of the foregoing roles placed Weichert in a position of trust with respect to Cellectar and obligated him to act for the benefit of Cellectar in all matters within the scope of his duties in his various positions.

168.     Weichert abused his position of trust and plainly failed to act in accordance with his duties and obligations by, *inter alia*:  (i) diverting the Cellectar IP, which rightfully belongs to Cellectar, from the company and toward his own company, Archeus; (ii) shielding Cellectar senior management from various steps taken by or at the direction of Weichert while at the company to hide the self-enrichment scheme, including instructing other Cellectar employees to "keep quiet" about developments and the shunting of the Cellectar IP through WARF; (iii) failing to maintain the confidentiality of the Cellectar IP; and (iv) hijacking the loyalty of other Cellectar employees, including Pinchuk, to further facilitate the scheme at the expense of Cellectar.

169.     In so doing, Weichert consciously used his position of trust in order to further his own private interests.

170.     As a result of Weichert's breach of his fiduciary duty to Cellectar, Cellectar has suffered monetary damages and irreparable harm, and is entitled to monetary and injunctive relief.

## COUNT V
### Tortious Interference with Contract (Against Weichert)

171.     Cellectar realleges and incorporates by reference Paragraphs 1-170 as if fully set forth herein.

172.     Pinchuk had valid contractual agreements with Cellectar governing his responsibilities and obligations at the company.

173.     Given Weichert's position as Cellectar's Chief Scientific Officer, as a Director, and as an individual supervising and directing Pinchuk's work on behalf of Cellectar, Weichert had knowledge of Pinchuk's contractual obligations, including but not limited to the intellectual property assignment, nondisclosure, and noncompetition terms (which also were present in Weichert's own employment contract).

174.     Weichert intentionally acted to interfere with Cellectar's contractual rights in its agreements with Pinchuk by inducing Pinchuk to, *inter alia*:  (i) fail to disclose his contributions to the Cellectar IP; (ii) purport to assign his contributions to the Cellectar IP to WARF; (iii) not maintain the confidentiality of Cellectar IP; (iv) resign from Cellectar in favor of becoming a consultant for Archeus; and (iv) attempt to rescind his written, signed admission that the Cellectar IP belongs to Cellectar and should not have been assigned to WARF.

175.     Weichert was not justified or privileged to interfere with Cellectar's contractual relationships with Pinchuk.

176.    Weichert's wrongful conduct disrupted Cellectar's rights in its contracts with Pinchuk because his conduct was the actual and proximate cause of Pinchuk's various breaches of his agreements and his departure from Cellectar.

177.    As a result of Weichert's interference with the contractual relationship between Cellectar and Pinchuk, Cellectar has suffered monetary damages and irreparable harm, and is entitled to monetary and injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Cellectar prays for the following relief:

A.      An award of monetary damages in an amount to be determined, including but not limited to actual damages;

B.      An award of injunctive relief that, *inter alia*, requires Defendants to take all necessary and appropriate steps to correct the public record with respect to ownership of the Cellectar IP;

C.      An award of costs of litigation and reasonable attorneys' fees; and

D.      Any other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable in this action.

Dated this 15th day of October, 2021.

**MICHAEL BEST & FRIEDRICH LLP**

/s/ *Marshall J. Schmitt*
Marshall J. Schmitt
Illinois Bar No. 6184893
444 West Lake Street, Suite 3200
Chicago, IL  60606-0030
Telephone: 312-222-0800
Facsimile: 312-222-0818
Email:  mjschmitt@michaelbest.com


Douglas R. Nemec (*pro hac vice pending*)
Jordan A. Feirman (*pro hac vice pending*)
Ryan P. Bisaillon (*pro hac vice pending*)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Manhattan West
New York, NY 10001-8602
Telephone:  (212) 735-3000
Email:  douglas.nemec@skadden.com
          jordan.feirman@skadden.com
          ryan.bisaillon@skadden.com

*Attorneys for Plaintiff Cellectar Biosciences, Inc.*